******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* AARON MOORE
(SC 240221)

The petition of the defendant, Aaron Moore, filed February 13, 2025, for review of the trial court's denial of the defendant's motion to vacate the court's order regarding the posting of bond, having been presented to the court, it is hereby ordered granted, the relief requested is granted, and the trial court's order imposing the 30 percent cash bond requirement is vacated.

July 2, 2025

D'AURIA, J. In this opinion, we must discern the meaning of the phrase "essential element," as used in No. 23-53, § 36, of the 2023 Public Acts (P.A. 23-53), titled, "An Act Addressing Gun Violence" (act), codified at General Statutes § 53a-3 (24), and, in particular, § 38 of P.A. 23-53, codified at General Statutes § 54-64a (c), which amended other statutes that regulate when defendants accused of certain "serious firearm offense[s]" may be released on bond.

The defendant, Aaron Moore, seeks review of the trial court's order that he post 30 percent of his $1 million bond in cash directly with the trial court pursuant to § 54-64a (c). He contends that the court incorrectly imposed a 30 percent cash bond requirement because the state did not charge him with a "[s]erious firearm offense," as the legislature has defined that phrase in § 53a-3 (24). Specifically, none of the crimes that the state charged him with contained an "essential element" requiring that the state prove that he discharged, used, or was armed with and threatened the use of a firearm. Our review of the plain language of the relevant statutes leads us to conclude that the phrase

"essential element" has the same meaning that this court and the legislature have consistently considered it to have throughout our case law and statutes. We therefore vacate the trial court's order. If the legislature intended to achieve a different objective—which is entirely possible—it is its prerogative to amend the statutes to accomplish that goal, not ours. See, e.g., *Commission on Human Rights & Opportunities* v. *Edge Fitness, LLC*, 342 Conn. 25, 42–43, 268 A.3d 630 (2022) (acknowledging that our construction of plain and unambiguous statutory text "may lead to a result that might well have been unintended by the legislature" but that it is for legislature to make policy choice to correct it).

In January, 2025, the state arrested the defendant for his involvement in the death of the victim, John Williams, and charged him with conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a, criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 2017) § 53a-217c,[1] criminal possession of a firearm in violation of General Statutes (Rev. to 2017) § 53a-217,[2] and carrying a pistol without a permit in violation of General Statutes (Rev. to 2017) § 29-35 (a).[3] The arrest warrant affidavit alleged that the defendant and his friend, Eric Diaz, were in a feud with Williams, and that the defendant had gained access to Williams' phone contacts and had begun selling drugs to Williams' customers. In December, 2018, the defendant and Williams got into a car chase during which Williams, or other individuals in his car, fired

---

[1] All references in this opinion to § 53a-217c are to the 2017 revision.

[2] All references in this opinion to § 53a-217 are to the 2017 revision.

[3] All references in this opinion to § 29-35 are to the 2017 revision.

several gunshots at the defendant. Two hours later, the defendant and Diaz, each carrying firearms, located Williams sitting in his vehicle and approached from different directions. The defendant fired six gunshots at Williams from the rear of the vehicle, while Diaz fired eight gunshots at Williams from the left side of the vehicle. Two of the bullets consistent with the caliber of Diaz' gun traveling from the direction he was shooting struck and killed Williams.

Before the defendant's arraignment, the state filed the standard Judicial Branch form, JD-CR-205 (new October, 2023), petitioning the court to require the defendant, if released on bond, to deposit directly with the court at least 30 percent of the bond amount the court set pursuant to § 54-64a (c) (1) and (2). See appendix to this opinion. The first part of the form required the state to specify which "[s]erious firearm offense," as defined by § 53a-3 (24), the state alleged that the defendant had committed. The state did not list any offenses on this part of the form. In the second part of the form, the state checked the box indicating that the defendant "is a serious risk to the safety of another person or persons . . . ." At the defendant's arraignment in part B of the Superior Court, the court set the defendant's bond at $1 million, granted the state's petition requiring that 30 percent of that amount be posted in cash with the court, and transferred the matter to part A of the Superior Court.

The defendant then moved the trial court to vacate or reconsider its decision granting the state's petition for a 30 percent cash bond on the ground that none of the charges against him constituted a "[s]erious firearm

offense," as defined by § 53a-3 (24). He argued that none of the crimes the state had charged him with was expressly listed in § 53a-3 (24), and none contained an "essential element . . . that the person discharged, used or was armed with and threatened the use of a firearm . . . ." General Statutes § 53a-3 (24). Relying on this court's interpretation of the phrase "essential elements" in *State* v. *King*, 346 Conn. 238, 288 A.3d 995 (2023), the defendant argued that "essential elements" means "the basic and necessary parts of the [statute], including the actus reus, mens rea, and causation . . . ." Id., 247. Applying *King*'s interpretation of "essential elements," the defendant contended that none of the charged offenses required the state to establish that he had discharged, used, or was armed with and threatened the use of a firearm.

Several days later, the court, in part A of the Superior Court, heard the parties' arguments on the defendant's motion to vacate. In response to defense counsel's arguments, the prosecutor advanced a more expansive interpretation of "essential element," permitting the court to go beyond the statutory elements of the charged offenses and to examine the conduct alleged in the arrest warrant. The prosecutor argued that the charge of conspiracy to commit murder was a "serious firearm offense" because the arrest warrant affidavit alleged that the defendant had used a firearm. The prosecutor argued that it was "preposterous" to conclude that the legislature had intended to impose a 30 percent cash bond requirement for less serious crimes, such as threatening in the first degree with a firearm in violation of General Statutes § 53a-61aa (a) (3) but not for serious crimes such as murder.

The trial court denied the defendant's motion to vacate, finding that the defendant posed a "serious safety concern . . . ." Relying on the language in form JD-CR-205, rather than the language in §§ 53a-3 (24) and 54-64a (c), the court determined that its finding that the defendant was a "serious safety concern" was dispositive and that it did not need to determine whether any of the charged crimes constituted a "serious firearm offense"; nor did it need to decide what the legislature intended by its use of "essential element." The defendant petitioned the Appellate Court for review of the trial court's denial of his motion to vacate pursuant to General Statutes § 54-63g and Practice Book § 78a-1, and, upon that court's request, we transferred the petition to this court. See Practice Book § 65-1A.

I

We begin with the pertinent legislation. In June, 2023, the legislature passed a comprehensive act addressing gun violence, which included the two provisions relevant to this appeal. See P.A. 23-53, §§ 36 and 38. Public Act 23-53, § 38 (codified at § 54-64a (c) (2)), provides in relevant part: "When any arrested person charged with the commission of a serious firearm offense, as defined in section 53a-3 . . . is presented before the Superior Court, the court shall, in bailable offenses, promptly order the release of such person upon the first of the following conditions of release found sufficient to reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered . . . (C) upon such person's execution of a bond without surety in no greater amount than necessary, or (D) upon such person's execution of a bond with surety in no greater amount than neces-

sary, but in no event shall a judge prohibit a bond from being posted by surety. . . . If the court finds that the arrested person poses a serious risk to the safety of another person or persons, the arrested person may only be released pursuant to subparagraph (C) or (D) of this subdivision and the arrested person shall be required to deposit at least thirty per cent of any bond amount directly with the court. . . . .'' Section 36 of P.A. 23-53 (codified at § 53a-3 (24)), defines "serious firearm offense" as "a violation of section 29-36, 29-36a . . . or 53-202w . . . possession of a stolen firearm or a firearm that is altered in a manner that renders the firearm unlawful, or any crime of which an essential element is that the person discharged, used or was armed with and threatened the use of a firearm . . . .''

The parties do not dispute how these two statutes interact. Both agree that § 54-64a (c) (2) permits the court to require that the defendant post 30 percent of any bond amount in cash directly with the court *if* the defendant has been charged with the commission of a "serious firearm offense," as defined by § 53a-3 (24), *and* the court finds that the defendant poses a serious risk to the safety of another person.[4] The parties do not agree, however, on what the legislature meant by "essential element" in § 53a-3 (24), defining "[s]erious firearm offense . . . .''

The defendant contends that the legislature's use of "essential element" unambiguously refers to the basic legal elements of an offense and does not include the

---

[4] The state acknowledges that the trial court misinterpreted § 54-64a (c) by finding only that the defendant posed a serious risk to the safety of another person and by not addressing whether the defendant also was charged with a "serious firearm offense." The trial court might have been led astray because the state did not complete the first part of the JD-CR-205 form, which required the state to specify which "[s]erious firearm offense," as defined by § 53a-3 (24), it alleged that the defendant had committed.

factual foundation that the state alleges, and would have to prove, to establish these legal elements, as contained in the arrest warrant affidavit or otherwise. The defendant further contends that we should not consider the legislative history of P.A. 23-53 because "essential element" is unambiguous, and his interpretation does not lead to absurd results.

The state does not dispute that the defendant's reading of "essential element" is reasonable, limiting a court to consideration of the elements of the charged offense when determining whether to require 30 percent of the defendant's bond in cash. Instead, it contends that "essential element" is ambiguous because it also is reasonable to interpret that phrase to permit a court to consider the facts the state would use to prove the legal requirements of a crime. The state alternatively argues that, even if the defendant is correct that the phrase "essential element" is unambiguous, it would yield an absurd result by permitting the court to require a 30 percent cash bond for less serious crimes but not for more serious crimes, such as murder. Because the state argues that "essential element" is either ambiguous or, under the defendant's interpretation, absurd, it directs us to the expansive legislative history of P.A. 23-53, which it contends supports its interpretation of § 53a-3 (24).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine the meaning of a statute, [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to the broader statutory scheme. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not

be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Citations omitted; internal quotation marks omitted.) *State* v. *Schimanski*, 344 Conn. 435, 447, 280 A.3d 92 (2022); see also 2A N. Singer & S. Singer, Sutherland Statutes and Statutory Construction (7th Ed. 2014) § 46:1, pp. 158–59 (plain meaning rule directs that legislative intent is gleaned from what is said, not from what legislature might have intended to say). In determining whether a statute is ambiguous or absurd, § 1-2z directs us not to consult extratextual sources, including "the legislative history and circumstances surrounding its enactment" or "the legislative policy it was designed to implement . . . ." (Internal quotation marks omitted.) *State* v. *Ward*, 306 Conn. 698, 708, 52 A.3d 591 (2012); see also *Gardner* v. *Dept. of Mental Health & Addiction Services*, 351 Conn. 488, 506, 331 A.3d 1203 (2025); *Cochran* v. *Dept. of Transportation*, 350 Conn. 844, 865, 327 A.3d 901 (2024). Because statutory interpretation is a question of law, our review is plenary. See, e.g., *State* v. *Hurdle*, 350 Conn. 770, 780, 326 A.3d 528 (2024).

## II

We begin with the plain meaning of the phrase "essential element." In determining the plain meaning of statutory language, the very first provision in our statutes, General Statutes § 1-1 (a), mandates that "words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." Therefore, "[i]t is well established that, to construe technical legal terms, we look for evidence of their familiar legal meaning in a range of legal sources, including other statutes, judicial decisions, and the common law." *State* v. *Menditto*, 315

Conn. 861, 868, 110 A.3d 410 (2015). "[W]ords having a determined meaning at common law generally are given that same meaning in a statute. . . . [L]egal terms . . . absent any legislative intent shown to the contrary, are to be presumed to be used in their legal sense. . . . Words with a fixed legal or judicially settled meaning must be presumed to have been used in that sense. . . . In ascertaining legislative intent [r]ather than using terms in their everyday sense, [t]he law uses familiar legal expressions in their familiar legal sense." (Citation omitted; internal quotation marks omitted.) *State* v. *Dupigney*, 295 Conn. 50, 59, 988 A.2d 851 (2010).

Although our statutes do not provide a definition for "essential element," a review of our case law reveals that the phrase has acquired a "peculiar and appropriate meaning in the law" that applies consistently across a wide variety of subject matters. General Statutes § 1-1 (a). For example, only a few months before the legislature passed P.A. 23-53 in June, 2023, we released *State* v. *King*, supra, 346 Conn. 238, in February, 2023, in which we interpreted the phrase "essential elements" as used in General Statutes § 14-227a.[5] *State* v. *King*, supra, 248. Interpreting only the plain language of that statute without resort to any extratextual evidence, we reasoned that "[i]t is notable and important to our analysis that the legislature did not use only the word 'elements' but modified it through the use of the adjective 'essential.' The statutory scheme does not, however, define either the word 'essential' or the word 'elements.' Black's Law Dictionary defines 'essential' as '[o]f, relat-

---

[5] General Statutes § 14-227a (g) provides in relevant part: "For purposes of the imposition of penalties for a second or third and subsequent offense pursuant to this subsection . . . a conviction in any other state of any offense the *essential elements* of which are determined by the court to be substantially the same as subdivision (1) or (2) of subsection (a) of this section, section 14-227m, subdivision (1) or (2) of subsection (a) of section 14-227n or section 53a-56b or 53a-60d, shall constitute a prior conviction for the same offense." (Emphasis added.)

ing to, or involving the essence or intrinsic nature of something . . . [o]f the utmost importance; basic and necessary.' Black's Law Dictionary (11th Ed. 2019) p. 687; see also Webster's New World Dictionary of the American Language (2d College Ed. 1972) pp. 478–79 ('[e]ssential' is defined as 'of or constituting the intrinsic, fundamental nature of something; basic, inherent'). Additionally, Black's Law Dictionary defines 'elements of crime' as '[t]he constituent parts of a crime . . . consisting of the actus reus, mens rea, and causation—that the prosecution must prove to sustain a conviction.' Black's Law Dictionary, supra, p. 657." *State* v. *King*, supra, 248–49. In *King*, we distilled these definitions as meaning "*the basic and necessary parts of the crime, including the actus reus, mens rea, and causation* . . . ." (Emphasis added.) Id., 249. We then applied this definition to analyze whether the statutorily required elements of the offense in § 14-227a were substantially the same as those in Fla. Stat. Ann. § 316.193 (1). See *State* v. *King*, supra, 249–52, 265–66.[6]

---

[6] The state attempts to distinguish *King* by arguing that the statute we analyzed in that case, § 14-227a, applied to the "essential elements" of an "offense," whereas § 53a-3 (24) applies to the "essential element" of a "crime." There is no indication either in *King*, § 14-227a, or § 53a-3 (24) that the legislature intended "offense" to have a meaning different from "crime." Although we would usually pay heed to the canon of statutory construction providing that, when the legislature uses a different term, we presume that it intends a different meaning; see, e.g., *Seramonte Associates, LLC* v. *Hamden*, 345 Conn. 76, 86, 282 A.3d 1253 (2022); even within § 53a-3 (24), the legislature has used the terms interchangeably, defining a " '[s]erious firearm *offense*' " in part as "any *crime* of which an essential element is that the person discharged . . . [or] used . . . a firearm . . . ." (Emphasis added.) General Statutes § 53a-24 (a). Similarly, General Statutes § 53a-24 (a) defines "*offense*" to mean "any *crime* or violation which constitutes a breach of any law of this state or any other state, federal law or local law or ordinance of a political subdivision of this state . . . ." (Emphasis added.) The state has provided no authority that supports a definition of "crime" that would advance its position, and we have identified none. Cf. *State* v. *King*, supra, 346 Conn. 248 (using Black's Law Dictionary definition of " 'elements of *crime*' " when relevant phrase in § 14-227a (g) was "offense the essential elements of which" (emphasis added)).

Consistent with *King*, hundreds of our cases use the phrase "essential element" to mean the basic legal requirements sufficient to prevail on either a civil or criminal claim. See, e.g., *State* v. *Abraham*, 343 Conn. 470, 489, 274 A.3d 849 (2022) (double jeopardy principles require analysis of statutory elements to determine whether "each crime requires proof of an essential element that the other does not under [*Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)]," without consideration of either "the evidence adduced at trial or the facts alleged in the state's charging document"); *State* v. *Daniels*, 342 Conn. 538, 552, 271 A.3d 617 (2022) (reviewing "essential elements" of crimes outlined by statute to determine whether verdict was inconsistent); *Peek* v. *Manchester Memorial Hospital*, 342 Conn. 103, 111, 269 A.3d 24 (2022) (outlining " 'essential elements' " necessary to prevail on negligence claim); *State* v. *Pond*, 315 Conn. 451, 477, 108 A.3d 1083 (2015) (reviewing statute to ascertain "essential elements" of crime that state must prove); *State* v. *LaFleur*, 307 Conn. 115, 125, 51 A.3d 1048 (2012) (interpreting statute to determine if jury instructions accurately conveyed " 'essential elements of the alleged crime that must be proved by the government beyond a reasonable doubt' "); *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 548, 791 A.2d 489 (2002) (outlining "essential elements" of proof required for equitable estoppel); *State* v. *Huot*, 170 Conn. 463, 467, 365 A.2d 1144 (1976) (comparing "essential elements" of two crimes to determine whether one was lesser included offense of other).

We presume that, when the legislature used the phrase "essential elements" in § 53a-3 (24), it was cognizant not only of *King*, in which we had just interpreted the plain meaning of that phrase,[7] but, of all of our

---

[7] We presume that the legislature also was aware of the Appellate Court's analysis two years earlier in *State* v. *King*, 204 Conn. App. 1, 15–18, 251

case law in which we have used the phrase "essential element" specifically to mean the legal requirements to prevail on a claim. See *State* v. *Lamantia*, 336 Conn. 747, 757 n.7, 250 A.3d 648 (2020) ("[i]t is well established that, in interpreting a statute, this court is bound by our prior constructions," and "[w]e must presume that the legislature is aware not only of this rule of statutory construction, but also of our interpretation of [statutes]"); *State* v. *Menditto*, supra, 315 Conn. 868 (technical legal terms are to be construed in accordance with their familiar legal meaning established by judicial decisions and common law); *State* v. *Fernando A.*, 294 Conn. 1, 19, 981 A.2d 427 (2009) ("legislature 'is presumed . . . to be cognizant of judicial decisions relevant to the subject matter of a statute . . . and to know the state of existing relevant law when it enacts a statute' ").

In turn, we are obliged to recognize the legislature's frequent use of the phrase "essential elements" throughout our statutes, even beyond the Penal Code. See *State* v. *Schimanski*, supra, 344 Conn. 447 (§ 1-2z requires that, in construing statute, court must consider statute's relationship to other statutes). By our count, the legislature has used "essential elements" in at least seventeen statutes—mostly criminal in nature, but not exclusively—containing language like that at issue in *King*. See footnote 7 of this opinion; see also General Statutes § 12-407a (b); General Statutes § 14-227a (g); General Statutes § 14-227m (c); General Statutes § 38a-660 (n); General Statutes § 45a-447 (a) (1); General Statutes § 46b-59b; General Statutes § 46b-82a (a); General Statutes § 53a-3 (24); General Statutes § 53a-40 (a) and (b); General Statutes § 53a-40d (a); General Statutes § 53a-40f (a); General Statutes § 54-56g (a); General Statutes § 54-56j (a); General Statutes § 54-56r (a), (b), (e), (g)

A.3d 79 (2021), aff'd, 346 Conn. 238, 288 A.3d 995 (2023), in which the court determined that the "essential elements" of driving under the influence in § 14-227a were the statutorily required elements.

and (j); General Statutes § 54-102g (f); General Statutes § 54-250 (2) and (11); General Statutes § 54-253 (a). Moreover, after *King*, the legislature has not amended the phrase "essential elements" in any of these statutes. See *State* v. *Evans*, 329 Conn. 770, 807, 189 A.3d 1184 (2018) (" '[t]he legislature is presumed to be aware of the [courts'] interpretation of a statute and . . . its subsequent nonaction may be understood as a validation of that interpretation' "), cert. denied, 586 U.S. 1213, 139 S. Ct. 1304, 203 L. Ed. 2d 425 (2019).[8] We find it particularly instructive that, since our decision in *King*, the legislature has amended two of these statutes and left the phrase "essential elements" intact. See Public Acts 2024, No. 24-20, § 26 (revising subsection (h) of § 54-56g); Public Acts 2024, No. 24-24, § 26 (revising subsection (n) of § 54-56r). The fact that the legislature has declined to express any disagreement with this line of cases counsels against any different interpretation of "essential elements." See, e.g., *State* v. *Ashby*, 336 Conn. 452, 492, 247 A.3d 521 (2020). Rather, the legislature's choice to employ such an oft-used phrase of well-known meaning, to the exclusion of any other language it could have chosen, compels us to consider this as a manifestation of its intent that we construe the phrase consistent with the technical legal meaning that our courts have assigned to it. See *State* v. *Christopher S.*, 338 Conn. 255, 270, 257 A.3d 912 (2021). This conclusion gains additional force in light of the fact that the legislature declined to provide an alternative definition that would change or supplement the established meaning of the phrase. Cf. *State* v. *Inzitari*, 351 Conn. 86, 91, 329

[8] The legislature has incorporated its definition of "[s]erious firearm offense" in § 53a-3 (24), which also contains the phrase "essential element," into a handful of statutes other than § 54-64a. See, e.g., General Statutes § 53a-32 (violation of probation or conditional discharge); General Statutes § 54-64f (violation of conditions of release); General Statutes § 54-127 (rearrest). We are unable to glean any additional meaning of "essential elements" from its inclusion in these statutes.

A.3d 215 (construing specialized legislative definition of "child pornography" and associated terms), cert. denied,    U.S.    ,    S. Ct.    ,    L. Ed. 2d (2025).

The state advances no cases to counter the technical legal meaning this phrase has acquired in our case law or any cases that support its argument that "essential element" can also reasonably be understood in a way not limited to the basic legal requirements to prevail on a claim but, instead, as including the particular facts alleged to establish—or, to use the dissent's word, "satisfy"—those legal requirements in any given case.[9] The absence of supporting case law reinforces our conclusion that the state's reading is not a plausible one because it would require us to abandon, *for this statute alone*, our traditional understanding of the phrase "essential element," which we have consistently used to limit the state's burden to proving only those elements explicitly contained in the criminal statutes. See, e.g., *State* v. *Honsch*, 349 Conn. 783, 797, 322 A.3d 1019 (2024) (state need not prove location of murder because it is not "essential element"); *State* v. *Patrick M.*, 344 Conn. 565, 598, 280 A.3d 461 (2022) ("motive is not an

---

[9] To support its interpretation of the statute, the state relies in part on the language of form JD-CR-205, which requires the state to have a good faith basis to believe that "[t]he accused's conduct, *as alleged in the arrest warrant attached to this petition or presented to the court at arraignment*, constitutes a serious firearm offense(s), as defined by . . . § 53a-3, as amended by P.A. 23-53, § 36 . . . specifically: (Specify serious firearm offense(s)) . . . ." (Emphasis altered.) But, as the state acknowledges, our interpretation must focus on the language in the statute, not the form the Judicial Branch developed to implement that statute. See General Statutes § 1-2z; see also *State* v. *Bernacki*, 307 Conn. 1, 22 n.15, 52 A.3d 605 (2012) (forms "promulgated by the [J]udicial [B]ranch for the convenience of litigants and the bench" are not binding on courts when construing statutes), cert. denied, 569 U.S. 918, 133 S. Ct. 1804, 185 L. Ed. 2d 811 (2013). We direct the Chief Court Administrator to revise form JD-CR-205 in accordance with this opinion. See, e.g., *Goguen* v. *Commissioner Correction*, 341 Conn. 508, 526, 267 A.3d 831 (2021).

essential element of the crimes with which the defendant was charged”); *State* v. *Terwilliger*, 314 Conn. 618, 661 n.19, 104 A.3d 638 (2014) (intent to harm occupants of building “is not an essential element of the crime of arson”); *State* v. *Darryl W.*, 303 Conn. 353, 362 n.11, 33 A.3d 239 (2012) (“‘operability of a firearm is not an essential element of robbery in the first degree’ ”); *State* v. *Romero*, 269 Conn. 481, 505, 849 A.2d 760 (2004) (“time was not an essential element of the offenses with which the defendant was charged”); *State* v. *Lougiotis*, 130 Conn. 372, 376, 34 A.2d 777 (1943) (“[c]riminal intent is not an essential element in a sale of liquor to a minor”). For example, in § 54-64a (c), the legislature could have expressly permitted courts to consider those underlying facts in deciding whether to impose a 30 percent cash bond requirement. Or, it could have used different language in § 53a-3 (24) as a way of permitting courts to examine the allegations of the arrest warrant affidavit when determining whether the defendant was charged with a serious firearm offense. Toward that end, the legislature could have, as the dissent suggests, written that statute to impose stricter pretrial release requirements on individuals who allegedly commit “criminal acts in which an essential element, the actus reus . . . has been satisfied by the discharge, use, or the act of being armed with and threatening the use of a firearm, *regardless of whether the language of the charged statute includes those terms*.” (Citation omitted; emphasis added.) Part II of the dissenting opinion. That is simply not what the statutes say. In particular, we decline to import the words “has been satisfied by” into the definition of “serious firearm offense,” which would, in our view, not result in a plausible, alternative meaning of the term “essential element.” Instead, the dissent’s definition would simply rewrite the statute, creating a definition and meaning other than that both we and the legislature have consistently employed, usu-

ally to the state's benefit.[10] See *State* v. *Christopher S.*, supra, 338 Conn. 270.

The dissent latches onto the language in § 54-64a (c) (2) permitting the state to present evidence to establish whether the defendant is "a serious risk to the safety of another person or persons . . . ." Like the trial court, the dissent conflates the separate requirement of a "serious firearm offense" with whether the defendant is a serious safety risk. See footnote 5 of this opinion. Section 54-64a (c) contains no language permitting the state to present evidence to establish whether a defendant committed a "serious firearm offense . . . ."

Because *King* and our other abundant case law have assigned and recognized a technical legal meaning to the phrase "essential element," our legislatively directed statutory interpretation principles; see General Statutes §§ 1-1 (a) and 1-2z; compel us to conclude that the phrase "essential element" unambiguously means the basic and necessary parts of the offense the state must establish to obtain a conviction.

### III

Alternatively, the state argues that interpreting the phrase "essential element" as unambiguously encompassing only the legally required elements of an offense leads to absurd and unworkable results. The state argues that, "[f]or example, under the defendant's interpretation, a defendant who intends to inflict serious physical injury and uses a firearm to cause the death

---

[10] To illustrate how the dissent would rewrite § 53a-3 (24), we provide the pertinent text of § 53a-3 (24) as compared to the dissent's new definition, with deleted language in brackets and new language in underline: " 'Serious firearm offense' " means . . . [any crime of which] those criminal acts in which an essential element [is that], the actus reus, has been satisfied by the [person] discharge[d], use[d], or [was] the act of being armed with and threaten[ed]ing the use of a firearm, regardless of whether the language of the charged statute includes those terms.

of another would have committed a serious firearm offense because manslaughter in the first degree with a firearm, under General Statutes § 53a-55a, includes an element that the defendant used or was armed with and threatened the use of a firearm. However, a defendant who shoots and kills the same intended victim, intending to kill him instead of intending to cause only serious physical injury, has not committed a serious firearm offense because the crime of murder [under General Statutes § 53a-54a] does not require elemental proof that the defendant used or threatened the use of a firearm," and, therefore, would not be required to post a 30 percent cash bond.[11] We are not persuaded that the meaning we ascribe to the legislature's choice of language is either absurd or unworkable.

The absurdity exception to the principles of statutory interpretation permits a court to consider an interpretation of the statutory text other than that which the clear and unambiguous meaning of the text compels when that meaning would lead to absurd or unworkable results. See General Statutes § 1-2z; see also *State* v. *Smith*, 317 Conn. 338, 349, 118 A.3d 49 (2015). A statute is absurd if, "although not literally impossible to effectuate," the result of an unambiguous interpretation is "so bizarre, impracticable, or contrary to common sense that one cannot reasonably assume that [it] reflect[s] the considered intent of the legislature." *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, 350 Conn. 525, 546, 325 A.3d 196 (2024). "[A] statute is

____

[11] General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm."

Before the trial court, the prosecutor compared murder to a different offense: threatening in the first degree. See General Statutes § 53a-61aa (a) (3).

not absurd merely because it produces results that a court or litigant finds anomalous or perhaps unwise. To the contrary, courts should look beyond a statute's text under the canon against absurdity only [when] the result of applying the plain language would be, in a genuine sense, absurd, i.e., [when] it is *quite impossible that* [*the legislature*] *could have intended the result* and [when] the alleged absurdity is so clear as to be obvious to most anyone." (Emphasis added; internal quotation marks omitted.) *PPC Realty, LLC* v. *Hartford*, 350 Conn. 347, 360, 324 A.3d 780 (2024); see also A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts (2012) p. 237 ("error-correction for absurdity can be a slippery slope," leading to "judicial revision of public . . . texts to make them (in the judges' view) more reasonable"). The state agrees that, just as § 1-2z precludes us from considering legislative history in determining whether the text of a statute is ambiguous, it also does not allow us to consider legislative history to prove that the result of our interpretation is absurd. See, e.g., *Gardner* v. *Dept. of Mental Health & Addiction Services*, supra, 351 Conn. 506; see also *State* v. *Ward*, supra, 306 Conn. 708 (absurdity inquiry cannot be based on legislative history, circumstances surrounding enactment, or legislative policy statute was designed to implement).

Addressing the example the state itself uses, we cannot agree that it is "absurd," as our case law defines that term, to conclude that the legislature intended the 30 percent cash bond requirement to apply to a crime such as manslaughter in the first degree with a firearm but not to the more serious crime of murder. The legislature has directed that courts base their initial bond determination on "[t]he nature and circumstances of the offense" and "the number and seriousness of charges pending against the arrested person . . . ." (Internal quotation marks omitted.) *State* v. *Pan*, 345 Conn. 922,

955, 291 A.3d 82 (2022); see id., 943 ($20 million bond on murder charge was appropriate because it was set in accordance with required considerations); see also General Statutes § 54-64a (b) (2). It would be entirely reasonable for the legislature to assume that the 30 percent cash bond requirement was not necessary in that instance because a court applying these factors would consider a class A felony such as murder, committed with a firearm, to constitute a serious enough charge that the bond amount it set would be sufficient to "reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered . . . ." General Statutes § 54-64a (b) (2). The legislature promoted the fundamental purposes of our bond statutes; see *State* v. *Pan*, supra, 939; by imposing the 30 percent cash bond requirement for select firearm offenses that, under many circumstances, would command a lower initial bond amount than a class A felony such as murder. In fact, the trial prosecutor in the present case understood this precisely and requested that the trial court, if it "were to find that 30 percent is not applicable," impose "a higher bond than the $1 million that is set based on the aggravating circumstances of the killing here."

The state also posits that, if we agree with the defendant's interpretation of the definition of "[s]erious firearm offense," the last clause of § 53a-3 (24) (which the dissent refers to as the residual clause) would encompass only four crimes: General Statutes § 53-203 (unlawful discharge of firearms), General Statutes § 53-204 (hunting or discharging firearm from public highway), General Statutes § 53a-59 (a) (5) (assault in first degree by discharge of firearm) and General Statutes § 53a-217e (d) (negligent hunting in third degree). It would be absurd, the state argues, to conclude that the legislature intended the definition to cover so few crimes.[12]

---

[12] The state's modest collection of offenses contrasts with its other arguments contending that the defendant's construction would include man-

The state ignores the first two-thirds of the statutory definition of a "[s]erious firearm offense," however, which also lists as among the offenses subject to the trial court's discretion in requiring a 30 percent cash bond, "a violation of section 29-36, 29-36a or 53-202w, [or] possession of a stolen firearm or a firearm that is altered in a manner that renders the firearm unlawful . . . ." General Statutes § 53a-3 (24). Thus, even if the number of offenses covered by any portion of § 53a-3 (24) were somehow important to an absurdity analysis—a proposition that is by no means obvious and for which the dissent cites no authority—the first clause lists only three offenses, the second clause describes perhaps four offenses,[13] and, by the state's count, the residual clause of the statutory definition of "[s]erious firearm offense"—"any crime of which an essential element is that the person discharged, used or was armed with and threatened the use of a firearm"—also captures four offenses. Each of the clauses includes offenses that are "serious" under any fair understanding of that word.

We do not invoke the absurdity exception, however, merely because the plain language of the legislature's chosen definition unambiguously does not reach a wider swath of Penal Code offenses than we, as judges, might suspect that the legislature would have wanted to include. See *Kuchta* v. *Arisian*, 329 Conn. 530, 545, 187 A.3d 408 (2018) ("[t]he mere fact that *a broader interpretation of advertising might more fully accomplish these purposes* does not permit us to ignore the meaning of the term compelled under the applicable

slaughter in the first degree with a firearm pursuant to § 53a-55a and threatening in the first degree pursuant to § 53a-61aa (a) (3).

[13] Although it is not necessary to the resolution of the present case that we describe precisely the offenses that the phrase "possession of a stolen firearm or a firearm that is altered in a manner that renders the firearm unlawful" captures, it likely includes some combination of General Statutes § 29-36, 53-202g, 53a-212 or 53a-217a.

rules of construction" (emphasis added)); see also A. Scalia & B. Garner, supra, p. 238 (absurdity doctrine "does not include substantive errors arising from a drafter's failure to appreciate the effect of certain provisions"). For example, the state advances no authority for the proposition that underinclusiveness amounts to absurdity or any case in which we have determined that the legislature could not have possibly intended that an act apply to a narrow set of circumstances. Cf. *Williamson* v. *Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S. Ct. 461, 99 L. Ed. 563 (1955) (legislature may enact reform one step at a time addressing "the phase of the problem which seems most acute to the legislative mind").

We likewise view the dissent's similar argument invoking the absurdity doctrine to constitute an attempt to correct what it believes to be "substantive errors arising from a drafter's failure to appreciate the effect of certain provisions." A. Scalia & B. Garner, supra, p. 238. Specifically, the dissent whittles down further the crimes covered by the "residual clause" and contends that the defendant's interpretation is absurd because it "results in only one *crime of violence* being considered a serious firearm offense." (Emphasis added.) Part I B of the dissenting opinion. But the phrase "crime of violence" does not appear in the statutes at issue. To the extent that the dissent fashions this phrase from a peek at the title of the act ("An Act Addressing Gun Violence"), it is at best arguable that this is appropriate. See *Algonquin Gas Transmission Co.* v. *Zoning Board of Appeals*, 162 Conn. 50, 55, 291 A.2d 204 (1971) ("Where there is ambiguity in the wording of a statute, the title of the legislation is an aid to statutory construction. . . . But if the language is clear and not subject to interpretation, titles are of less significance." (Citations omitted.)). More important, the title of the 2023 legislation was "An Act *Addressing* Gun Violence"; (emphasis

added); not "An Act Addressing *Crimes* of Violence." It is not debatable that the legislature could reasonably consider the regulation of how defendants may post bond for crimes that involve the possession, sale, purchase, mismarking, or discharge of a firearm to be a measure *addressing* gun violence, even if the offenses listed are not themselves "crimes of violence."[14] Again, the dissent's argument is simply that the legislation would be more effective if the legislature had adopted its definition of "serious firearm offense," covering more (and more serious) crimes. See footnote 10 of this opinion. In our view, by invoking the "absurdity doctrine"; part I B of the dissenting opinion; the dissent merely substitutes a definition that, "in [those] judges' view . . . [is] more reasonable"; A. Scalia & B. Garner, supra, p. 237; because the dissent has concluded that the plain meaning of the legislative text is "anomalous or perhaps unwise." (Internal quotation marks omitted.) *PPC Realty, LLC* v. *Hartford*, supra, 350 Conn. 360. This use of the doctrine sets the absurdity bar too low and constitutes precisely the substitution of judicial for legislative judgment that the legislature sought to prevent when it enacted § 1-2z. See *Commission on Human Rights & Opportunities* v. *Edge Fitness, LLC*, supra, 342 Conn. 42–43. The absurdity exception makes it our obligation to correct only " 'quite impossible' " results, and it is the legislature's prerogative to fix faulty or badly drafted legislation. *PPC Realty, LLC* v. *Hartford*, supra, 360. It is not our prerogative to substitute our own view of what the legislature might have intended to capture. It is not debatable that the offenses

[14] If the phrase "crime of violence" derives from the dissent's reading of the legislative history, it is likewise improper. See *State* v. *Ward*, supra, 306 Conn. 708. We have repeatedly held, and the state concedes, that the absurdity inquiry does not include "extratextual evidence . . . such as the legislative history and circumstances surrounding its enactment" or "the legislative policy it was designed to implement . . . ."(Internal quotation marks omitted.) Id.

listed specifically or described categorically in § 53a-3 (24) capture numerous "serious firearm offenses" under any plausible definition of that phrase. The dissent's complaint is that there are other serious firearm offenses that § 53a-3 (24) has *not* captured. But that is not an "absurd" result, as our case law defines absurd. Instead, it is no more than an observation "that a broader interpretation of [the phrase] might more fully accomplish [the statute's] purposes . . . ." *Kuchta* v. *Arisian*, supra, 329 Conn. 545. That, however, "does not permit us to ignore the meaning of the term compelled under the applicable rules of construction." Id.

The legislature's choice of the phrase "essential element" furthers several policy objectives. "At first blush, it may seem counterintuitive to focus on the legal definition of a given offense rather than an individual's actual conduct. After all, why should a court ignore the [real world] facts of what a person did in favor of a mechanistic approach that focuses on the elements of an offense? But throughout the categorical approach's long history, courts and agencies have offered sound reasons for using it." A. Jain & P. Warren, "An Ode to the Categorical Approach," 67 UCLA L. Rev. Discourse 132, 138 (2019). Those sound reasons include the promotion of uniform and consistent application so that all charges and defendants are treated similarly. Moreover, it is more efficient, as it permits the parties and the court to more readily identify which offenses are subject to the 30 percent cash bail requirement, without resort to evidentiary proffers on the likely disputed fact as to whether the defendant used a firearm. Any of these many practical considerations renders the legislature's choice of language not contrary to common sense.

Although the state acknowledges that we may consider legislative history only if we first determine that the statute is ambiguous or yields absurd results, it

nevertheless relies in part on lawmakers' remarks to support its absurdity argument. In particular, the state contends that this legislative history establishes that the purpose of the enactment "was to protect society from individuals who commit serious crimes using guns and [to] prevent those individuals from being able to commit additional such offenses." But the interpretation of § 53a-3 (24) we have drawn from the statute's unambiguous text accomplishes that goal, even if it is limited only to those crimes that require elemental proof that the defendant used a firearm. As previously discussed, it is not "bizarre, impracticable, or contrary to common sense"; *NEMS, PLLC* v. *Harvard Pilgrim Health Care of Connecticut, Inc.*, supra, 350 Conn. 546; for the legislature to have more narrowly focused on certain serious firearm offenses, while assuming that bail set for offenses such as murder, whether committed with a firearm or not, will be sufficient to secure an accused's presence throughout the proceedings.

The state's reliance on the purported general purpose of the entire act overlooks the narrow phrase at issue, "essential element,"[15] and incorrectly presumes that the legislature intended to enact the statutory provisions using a meat axe rather than a scalpel. See *United States* v. *Sun-Diamond Growers of California*, 526 U.S. 398, 412, 119 S. Ct. 1402, 143 L. Ed. 2d 576 (1999). We have in the past rejected similar "circular" legislative history arguments in which a defendant relies on legislative history to create an absurdity. See, e.g., *State* v. *Bischoff*, 337 Conn. 739, 759, 258 A.3d 14 (2021) (rejecting defendant's argument that legislative history created absurdity because it was supported only by extratextual sources, reference to which § 1-2z forbids); *State* v.

---

[15] Even though the act's legislative history is outside the scope of our review, we note that the state has not provided, and we are not aware of, any pertinent discussion of the intended meaning of the specific phrase "essential element."

*Ramos*, 306 Conn. 125, 140–41, 49 A.3d 197 (2012) (rejecting argument that legislators who passed amendment did not understand plain meaning of bill because § 1-2z barred courts' consideration of that legislative history).

In sum, when we construe a statute, "our only responsibility is to determine what the legislature, within constitutional limits, intended to do." (Internal quotation marks omitted.) *State* v. *Bischoff*, supra, 337 Conn. 763. If the legislature meant to include more crimes within the definition of "serious firearm offense" than the plain language of the statute admits, it will amend the statute to effectuate that result. See, e.g., *PPC Realty, LLC* v. *Hartford*, supra, 350 Conn. 361. The decision to do so involves a legislative policy choice that we decline to arrogate to ourselves by bending the statutory language and disregarding our well established and mandatory statutory interpretation principles, which we strive to apply consistently to the wide variety of subjects on which the General Assembly legislates. See id.

Applying the unambiguous meaning of "essential element," we conclude that the trial court incorrectly imposed the 30 percent cash bond requirement because the defendant was not charged with a "[s]erious firearm offense" pursuant to § 53a-3 (24). None of the crimes with which the defendant was charged—conspiracy to commit murder in violation of §§ 53a-48 and 53a-54a, criminal possession of a pistol or revolver in violation of § 53a-217c, criminal possession of a firearm in violation of § 53a-217, and carrying a pistol without a permit in violation of § 29-35 (a)—requires as an essential element that the defendant used or was armed with and threatened the use of a firearm, and the state does not contend otherwise.

In this opinion MULLINS, C. J., and McDONALD and ECKER, Js., concurred.